IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 1999 Session

## IN RE: ESTATE OF M.L. WAKEFIELD, DECEASED

**Appeal from the Probate Court of Davidson County**
**No. 94P1917     Frank G. Clement, Jr., Probate Judge**

---

**M1998-00921-COA-R3-CV - Filed December 10, 2001**

---

This case involves a dispute over the compensation sought by two of three co-executors of a will that was drafted by one of them. The will provided that the executors should be "paid fees equal to those fees customarily charged by NationsBank of Nashville." The two co-executors each received an interim payment of $50,000 in compensation, and then sought additional payments under the fee schedule. The adult beneficiaries of the will challenged the amount of compensation sought by the co-executors. Disagreements and tensions continued between the beneficiaries and the two non-family co-executors, and, after strong suggestion by the probate court, the two non-family co-executors resigned. The probate court heard evidence on the fee request and refused to award additional fees. The court also ordered the attorney co-executor, co-trustee to disgorge over $70,000 in attorney fees paid by the testamentary trust's major asset, a corporation formerly owned solely by testator. The co-executors, co-trustees were the directors of the corporation, and the disgorged fees had been paid pursuant to a retainer agreement pre-existing the testator's death. On appeal, the two co-executors contest these rulings. In a cross-appeal, the beneficiaries argue that the probate court erred in denying their request that the co-executors disgorge additional fees. We modify the trial court's award of reasonable fees but otherwise affirm.

### Tenn. R. App. P. 3  Appeal as of Right; Judgment of the Probate Court
### Affirmed as Modified and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN, J., joined. WILLIAM C. KOCH, JR., filed a separate opinion concurring in part and dissenting in part.

Hugh C. Howser, Nashville, Tennessee, for the appellants, Ronald H. Pursell and Robert Whisenant.

Richard Holton and Charles A. Trost, Nashville, Tennessee, for the appellees, Judith Wakefield Sandlin, Nancy Wakefield Coleman, Michael C. Wakefield, Linda Wakefield Melvin, Alden H. Smith, as guardian for Nathan Murry Green, and Susan R. Limor, as guardian for Timothy Louis Wakefield.

**OPINION**

Murrey Louis Wakefield, the testator, died in an automobile accident on December 18, 1994. He was seventy-eight (78) years old. Mr. Wakefield was survived by four adult children, Judith Wakefield Sandlin, Nancy Wakefield Coleman, Michael C. Wakefield, and Linda Wakefield Melvin. One of the testator's children, Timothy M. Wakefield, had predeceased the testator, leaving two minor sons, Nathan Murray Green and Timothy Louis Wakefield. These children and grandchildren were the beneficiaries of Mr. Wakefield's estate. At the time of the testator's death, his net taxable estate was worth over $5 million while his gross estate was valued at $10.6 million, according to the estate tax return. The principal asset was Feldkircher Wire Fabricating Company, Inc. ("FWC"), of which the testator had been the sole shareholder. In addition, the testator owned the real property on which FWC's several facilities were located, and houses and other real property, including a farm on which he conducted a cattle breeding operation.

The testator's will appointed three co-executors: his daughter, Ms. Sandlin; his longtime personal and business attorney, Mr. Pursell, and his longtime personal and business accountant, Mr. Whisenant. The will also named those three individuals as co-trustees of all trusts established under the will. The will provided for compensation in return for discharging the duties attendant to these positions, stating:

> No one acting as executrix, executor, or trustee shall be required to furnish any bond or security of any kind for the faithful performance of his or her duties as executrix, executor, or trustee. I direct that my co-executors and co-trustees herein shall be paid fees equal to those fees customarily charged by NationsBank in Nashville, Tennessee, or its successors for estate and trust administration services.

The will was drafted by Mr. Pursell, and the testator received advice from both Mr. Pursell and Mr. Whisenant regarding the method of compensation for the executors and trustees. The will contained several bequests of specific property to named individuals, and directed that the remainder of the estate's assets, which included the stock in FWC, should be placed in the M.L. Wakefield Family Trust. That trust was to be terminated prior to the eleventh anniversary of the testator's death.

The will also directed the co-trustees to continue to operate FWC as its board of directors until the trust was terminated. The company had not previously had a board of directors, with the testator having exclusive control of its management and operation. The will specified that the directors could sell FWC if they deemed it financially advisable. The will required the co-trustees to continue the testator's farming and cattle breeding activities and to restore a specified house for one of testator's children.

The will also included an *in terrorem* clause which provided for the revocation of the benefits of any beneficiary who contested the will. This clause stated:

If any beneficiary hereunder shall contest the probate or validity of this will or any provision herein, or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this will or to prevent any provision herein from being implemented in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided for such beneficiary are hereby revoked, and such benefits shall pass to the issue of said beneficiary, equally, or if the beneficiary dies without issue then such benefit shall pass pursuant to the terms and conditions stated herein. Each benefit conferred herein is made on the condition precedent that the beneficiary shall accept and agree to all the provisions of this will and the provisions of this paragraph are an essential part of each and every benefit.

On December 28, 1994, Mr. Pursell filed a petition to probate the testator's last will and testament. That day the probate court issued an order admitting the testator's will into probate. The co-executors then took steps to manage the estate, including retaining counsel to pursue claims against the driver of the car which collided with the testator,[1] finding alternative financing for FWC to retain its cash flow, and taking out a $950,000 loan to cover a portion of the federal estate taxes.

Almost from the first, controversy arose between the beneficiaries, including Ms. Sandlin, and the non-family co-executors, Mr. Pursell and Mr. Whisenant ("Appellants"). Early on, Appellants made it known that they thought it was in the estate's best interest to sell FWC. One suggestion Appellants made was to effectuate an employee stock option plan ("ESOP plan"), which would have given the employees ownership of the company, and they spent considerable time researching this option. The adult beneficiaries objected to this plan because they preferred to retain the company for themselves.

Mr. Pursell, or his law firm, initially also provided legal representation to the estate. Because of developing difficulties between Appellants and the beneficiaries, Appellants retained new counsel for the estate in the spring of 1996, "for the purpose of assisting in dealings with the beneficiaries and in order to remove any apparent conflict of interest that might arise from continuing representation by Mr. Pursell's firm." Mr. Whisenant's accounting firm provided accounting services to the estate.

The number of disagreements between Appellants and the beneficiaries is evidenced by the various filings over the course of the proceedings below and is acknowledged and recounted in the briefs before this court. Most of the substantive disputes regarding management of the estate's assets have been resolved and are not on appeal. Appellants resigned as Co-Executors and Co-Trustees, as reflected in an agreed order entered in July of 1997, in which the beneficiaries agreed to indemnify

---

[1] The executors made arrangements for Mr. Pursell's law firm to handle the matters arising from the collision that took the testator's life. Ultimately, the firm filed a wrongful death action which resulted in a settlement, approved by the court, for over $1.5 million, with the law firm receiving $495,037 in fees. The net proceeds were paid directly to the heirs.

Appellants from "any and all duties, responsibilities, liabilities, and/or obligations of either of them arising out of or in connection with the duties and obligations in each capacity."[2]  First American National Bank was appointed as substitute Co-Executor along with Ms. Sandlin.  That same order reflects that Appellants also resigned as directors of FWC.

The issues in this appeal involve compensation to Appellants.  The facts relevant to those issues involve a detailed procedural history, of which the following is a summary.  Beginning with the interim accounting for the period ending November 20, 1995, the beneficiaries have questioned details of accountings and questioned or opposed various actions proposed or taken by Appellants. For example, in an exception filed to this first accounting, three beneficiaries asserted that the accounting was inadequate, challenged the propriety of a $159,000 loan the estate made to FWC, and excepted to payment of over $128,000 in legal and professional fees.[3]

On April 9, 1996, Appellants petitioned the court for approval of fees, seeking payment for their activities as executors, members of the FWC board of directors, and accountants and lawyers for the estate.  They sought interim payments of $120,000 to be equally divided among the co-executors, and an hourly fee of $125 for their work on the board of directors.  On October 18, 1996, the probate court entered a consent order approving payment of an interim co-executors' fee of $150,000 to be divided equally among the three co-executors. The order also approved payments of legal and accounting fees.

On March 7, 1997, Appellants sought approval of another interim payment of executors' fees of over $91,000, which request had increased to $232,303 by the time of its hearing.  The adult beneficiaries filed an objection to this request, arguing that the co-executors had already received substantial compensation and that the estate was experiencing cash flow problems.[4]  Shortly thereafter,  the adult beneficiaries filed a petition for construction of will, seeking instruction on whether they could contest the fees sought by Appellants without triggering the *in terrorem* clause. The beneficiaries argued that in calculating the compensation as equal to that "customarily charged by NationsBank," reliance on the printed fee schedule should only be a starting point for calculating fees because parties in sizeable estates customarily negotiate and settle on fees smaller than those provided by strict application of the schedule.

---

[2]Federal and state estate taxes became due some nine months after the testator's death.  The estate owed approximately $2.7 million in estate taxes.  To make the initial payment, which was due in September of 1995, the estate had to borrow $950,000.  According to Appellants, the taxes deeply concerned them because they faced personal liability as co-executors if they were not paid.  Thus, the indemnity provision was an important part of any agreement.

[3]Shortly thereafter, Appellants filed a petition to sell real property, arguing that certain property should be sold to pay the estate's taxes, debts, expenses, personal representatives, and creditors.  The beneficiaries contested the petition.

[4]The same day, the beneficiaries filed a motion for appointment of business advisors, seeking the replacement of Appellants with two other individuals.

Appellants responded to the beneficiaries' petition for construction of the will by denying that the beneficiaries could seek instructions with respect to the *in terrorem* clause, arguing that doing so defeated the clause's purpose. They also filed a counterclaim, seeking a declaratory judgment enforcing the *in terrorem* clause, which would result in revocation of bequests to those beneficiaries who filed the petition for construction.

On June 27, 1997, the probate court, on its own initiative, held a status conference. At the outset, the court observed, "I have continued to see fee requests that are not modest . . . and I have gotten the clear indication that some beneficiaries are reluctant, if not scared, to bring matters to this court's attention." During this hearing, the court approved the beneficiaries' decision to retain two independent financial advisors and granted a 30-day stay on discovery to allow them to seek loans to pay the remainder of the estate taxes. At the hearing, Appellants acknowledged the adult beneficiaries' desire for their resignation, but argued that their resignation would not be in the estate's best interest.[5] However, Mr. Pursell ultimately agreed to resign as co-executor (after admitted, off-the-record encouragement by the probate court) on condition that the parties agreed to indemnify him and hold him harmless. Mr. Whisenant resigned shortly thereafter.

After Appellants' resignation, the issue of additional fees remained. The beneficiaries filed a memorandum responding to Appellants' application for approval of interim and final co-executors' fees, objecting to the award of additional fees to Appellants. Ultimately, the court heard nine days of testimony and argument on Appellants' second fee request and the beneficiaries' response thereto over a period of almost five months. At the conclusion of these proceedings, the court entered an order denying Appellants' application for additional fees, stating "they shall recover nothing further from this estate." The order specifically incorporated the oral findings made by the court at the conclusion of the hearing. Those findings include the following observation:

> The real fly in the ointment here starts, number one, with the lack of independent advice and counsel when a very complicated fee arrangement was proposed. I know Mr. Whisenant said it, that Mr. Wakefield said no to one or more proposed fee schedules . . . and then finally, when a fee schedule was suggested similar to that of a bank, and I think they presented NationsBank and one other bank's, I believe Mr. Whisenant and/or Mr. Pursell suggested that Mr. Wakefield's response was, "That's good. That' simple. That's the way I want it." And I believe that Mr. Wakefield did just want something simple; lay it out there and let's do it that-a-way. But there's two problems here. No one thoroughly explained -- the evidence is that no one of independent authority explained the fee schedule to him. And particularly Mr. Whisenant, I think, did a good job of trying to explain the fee schedule to Mr. Wakefield, and my notes indicated that he even ran a few numbers for him, but there

---

[5]Actually, the beneficiaries announced they would accept Appellants' resignations on terms and conditions previously offered by Appellants if the court approved. In addition, another unresolved matter of contention between the parties was raised. Appellants asserted that, subject to the court's approval, they were prepared to proceed with the ESOP plan providing for the employees' ownership of FWC. The adult beneficiaries successfully sought additional time to decide whether they wanted to make a counterproposal to that plan.

was no testimony from anyone that there was an explanation of what extraordinary services are or how they would be computed or how much they might be. Even to the contrary, the evidence suggests that the executors went to Mr. Jonathan Harwell, an officer with NationsBank Trust Department, or former officer, I don't know, and even needed his assistance to explain how it's done. And if that's the case, then Mr. Wakefield could have never understood it . . . I feel strongly that, based on the evidence I've heard for eight days, that no one was able to explain to Lou Wakefield what that NationsBank fee schedule really meant. And nobody's been able to explain to me when -- when a service is an extraordinary service or when it's not, and I'd like to think I'm of above average intelligence. Combine the extraordinary services with the fact that you've got -- and I'm not saying this is improper -- but you've got what I would say [is] double-dipping: you have executor's fees, director's fees, you have other fees, it's just so hard to accept the fact that then there can be a third or fourth or fifth category of income called "extraordinary services," so I have a serious problem with that.

The court then found that the NationsBank fee schedule, which, in large part, was premised on percentages of estate assets and income, was no longer applicable because Appellants had resigned. The court reasoned:

Since they did resign, it's impractical to apply the percentages, and a percent of this and percent of that. And that, combined with the lack of independent advice and counsel, both of those together are sufficient for me to state that the schedule is now inapplicable, and I do not, will not award them fees pursuant to the NationsBank schedule for those reasons.

The court declined to require Appellants to disgorge the $50,000 they each had previously received pursuant to the agreed order resolving their initial fee request, but ordered Mr. Pursell to disgorge the sum of $70,625, part of fees paid to him for legal services to FWC. Some factual background is necessary at this point.

Prior to the testator's death, Mr. Pursell was on retainer to FWC. Under their arrangement, FWC paid Mr. Pursell a $3,000 monthly retainer for legal services up to forty (40) hours. When Mr. Pursell worked more than forty (40) hours in a month, the corporation paid him at the rate of $100 per hour. Mr. Pursell charged his other clients an hourly fee of $200. This arrangement continued after the testator's death, apparently with the consent of the board of directors of FWC, of which Mr. Pursell was a member.

Mr. Whisenant had a similar retainer arrangement with the testator. He provided personal accounting and tax planning services to the testator, and his accounting firm received a monthly retainer from FWC of $4,000. His firm audited FWC's financial statements, books and records, and provided extensive management advisory services. At each year's end, the amount of the retainer ($48,000) was compared to the number of hours actually worked and, if it was less than $48,000,

FWC was given a credit for the following year. The firm continued to provide services to FWC after testator's death, again apparently with the consent of the three-member board, of which Mr. Whisenant was a member.

The court's oral findings explain its reasoning in regard to its order that Mr. Pursell return some of the fees he received under his retainer agreement with FWC after testator's death:

> As for Mr. Pursell's fee, which I believe was an additional $3,000 per month as the attorney for the corporation -- which I understand would be in addition to the director's fee . . . the evidence did establish that that was an arrangement consistent with what he and Mr. Wakefield had while Mr. Wakefield was alive. It appeared to be a very reasonable agreement, and one that's not at all uncommon, particularly among lawyers and clients who have a longstanding relationship. The problem is, after Mr. Wakefield's death, a lot of things changed. Not only was the client not there anymore, the attorney was really the client after Mr. Wakefield's death. Also, the attorney, Mr. Pursell, was receiving a co-executor's fee. Also, Mr. Pursell was receiving a director's fee. Also, Mr. Pursell's firm, which rendered valuable services through partners and other associates, they rendered services and they've been paid for those services. With all of those matters considered, it seems unreasonable -- that fee arrangement of $3,000 per month to Ron Pursell on a retainer agreement, to me appears to be clearly unreasonable, and that entire amount is denied. And to what extent it exceeds whatever else he's entitled to, must be regorged.

The two co-executors contest the court's rulings. In a cross-appeal, the beneficiaries argue that the probate court erred in denying their request that additional fees be disgorged. Because this case was tried in the probate court without a jury, the standard of review is *de novo* upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000). Furthermore, great weight must be given to the factual findings made by the trial court that rest on determinations of credibility. *Randolph v. Randolph,* 937 S.W.2d 815, 819 (Tenn. 1996). The presumption of correctness requires us to accept the trial court's findings of fact unless the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Estate of Haynes v. Braden*, 835 S.W.2d 19, 19-20 (Tenn. Ct. App. 1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise). To the extent that the determination of the issues rests on issues of law, they receive plenary review. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998).

## I. The Compensation Request

After resignation by Appellants and after various other matters were resolved, the only outstanding issues involved a final accounting by the resigning co-executors, Appellants, and their request for additional compensation.[6]

The beneficiaries responded to the petition by asserting (1) the court should apply a reasonableness standard to the fees requested; (2) any fee request based on the value of the estate's corpus must be examined in the context of the resignation of the executors, prior to closing of the estate, and appointment of a successor executor; (3) the considerations applicable to professional fees should be applied to executor fees where the professional is acting as both executor and lawyer or accountant, and that standard is "reasonableness"; (4) it is impossible to determine what fees NationsBank would have charged in this instance because it was not unusual for the bank to negotiate a deviation from the schedule for large estates; (5) the compensation provision in the will, especially when combined with the *in terrorem* clause as interpreted by Appellants, was beneficial to Appellants, both of whom participated in the drafting of the will and were in fiduciary relationships with the testator, with the result that Appellants had the burden of establishing by clear and convincing evidence that the provision was not the result of undue influence; (6) the court should consider the totality of fees and compensation paid to Appellants in their various roles in relation to testator's affairs; and (7) because an excessive fee has been charged or sought, Appellants were entitled to no fees. The beneficiaries asserted the fees were excessive and unreasonable.[7]

Appellants replied by asserting (1) they sought to be paid in accordance with the terms of the will; (2) the intent of the testator regarding compensation is paramount and must be effectuated; and (3) the only issue for consideration by the court was the extent of "extraordinary services" which entitled Appellants to compensation beyond the percentage fees. Appellants stated they would present to the court "their time records indicating services rendered by them as co-executors, directors, as legal counsel and accountants, for review and consideration by the Court, in making an independent determination as to whether or not extraordinary services were performed." They also described their efforts on behalf of the estate and their activities regarding a number of issues, for example, the ESOP proposal.

---

[6]Although Ms. Sandlin, the other co-executor and co-trustee, did not ask for additional fees, she "expect[ed] to receive one-third of whatever co-executors' fees are approved by the court." At the hearing, Ms. Sandlin's position was clarified: as a beneficiary, she objected to any additional fees, and she did not think the co-executors were entitled to any additional fees. As a co-executor, her position was that if the co-executors were awarded additional fees, she was entitled to one-third.

[7]In their response, the beneficiaries also questioned the contingency fee paid to Mr. Purcell's firm for handling the wrongful death claim pursuant to an agreement between the firm and the co-executors, including Appellants, with no negotiation with the beneficiaries, under EC 2-20 of the Code of Professional Responsibility. These fees were approved by another court in settlement of the wrongful death action. On appeal, the beneficiaries have not raised any issues regarding these fees.

The motion for additional fees was amended to result in a final request for an additional $232,303 in co-executor fees. That request was based upon the NationsBank Fee Schedule[8] and requested:

| | |
|---|---|
| $120,902 | Fee based on the schedule's stepped percentages to the gross estate |
| 161,889 | Fee based on schedule's 6% charge on income to the estate. |
| 32,820 | Fee for sale of real estate, computed at 3% for broker-assisted sales And 7% on unassisted sale |
| $315,611 | |
| -150,000 | Less interim fees already paid |
| $165,611 | |
| 29,962 | Fees for "extraordinary services" by Mr. Pursell(239.7 hours) |
| 36,730 | Fees for "extraordinary services" by Mr. Whisenant (293.6 hours) |
| $232,303 | Total additional fees requested |

At the beginning of the hearing, counsel for Appellants stated the request was for an additional $165,611; obviously that amount did not include fees for extraordinary services. Appellants took the position that there could be no question about their entitlement to an additional $165,611 because of the application of the percentage computations under the NationsBank fee schedule. During the course of the hearing, Appellants also testified about additional services, beyond those required in "ordinary" estate administration, for which they claimed $125 per hour as "extraordinary services" under the fee schedule.

The beneficiaries clarified their position regarding the fee request,[9] stating, in part:

We think that there are issues before the Court that [counsel for Appellants] intends to explore fully and we certainly intend to explore fully. The use of a fee schedule in conjunction with the in terrorem clause we believe was a conflict of interest. The pursuit of the sale a conflict - - of the ESOP trust we believe was a conflict of interest. We think there were multiple billings and fee arrangements between the parties and various entities which they controlled, as a result of their fiduciary

---

[8]According to an affidavit from a vice president of NationsBank, that institution bases its fee for 'ordinary' services on a percentage of the asset value of the estate and a percentage of the income received by the estate during administration. In addition, the bank would customarily request an enhanced fee 'for services rendered beyond the normal time spent by an executor on an ordinary estate', or 'extraordinary services.' According to the schedule, the administration charge is calculated at 5% on the first $100,000 of estate assets, 3% on the next $300,000, 2% on the next $600,000, and 1% on all over $1,000,000. A fee of 6% is charged on the gross income received during administration.

[9]Appellants have maintained on appeal that various issues were not properly before the trial court. To the extent those assertions are based on claims the beneficiaries failed to raise those issues, the response summarized earlier and the statements of the beneficiaries' counsel at the beginning of the hearing demonstrate that the beneficiaries objected to additional fees on the various bases enumerated.

positions and without there being any check or balance, particularly with regard to payment of directors' fees for a company for which they were directors. We think that in total the fee request is excessive commensurate with the work done and the value provided, and then also in connection with the totality of the fees being assessed.

The proof at the hearing provided details of the totality of fees paid to Appellants for the several fiduciary positions during the approximately thirty months from the testator's death in December 1994 until their resignation as co-executors, co-trustees, and company directors, in late June of 1997. During that period, Appellants and their firms were paid a total of $623,114 for their services in several capacities: executors and trustees, directors of the company, attorney and accountant for the estate, and attorney and accountant for the company. Mr. Pursell or his firm was paid a total of $311,707. Mr. Whisenant or his firm received a total of $311,407.

Each was paid $50,000 in executor and trustee fees in accordance with the agreed order approving the initial interim fee request. In addition, each received substantial payments for their services as directors of FWC, with Mr. Pursell being paid $135,232, and Mr. Whisenant receiving $123,684.[10] Mr. Pursell's firm was paid $26,683 for its services as counsel for the estate until the firm's resignation in May 1996. Mr. Pursell was paid $90,000 under his retainer arrangement with FWC, at $3,000 per month for thirty months. Mr. Pursell's law firm was paid another $9,792 for services to FWC on an hourly basis, apparently outside the retainer arrangement.[11] Similarly, Mr. Whisenant's firm received $55,113 for accounting services provided to the estate and $82,610 for such services provided to FWC.

In Appellants' submissions and at the hearing, Mr. Pursell testified and presented time records reflecting that he had expended 475.9 hours as co-executor "over and above any time spent as a member of the Board of Directors or for legal services provided to Feldkircher Wire Fabricating Co., Inc." As indicated above, Mr. Pursell considered 239.7 of those hours to have been spent on extraordinary services. Similarly, Mr. Whisenant testified that he spent 496.3 hours on co-executor duties, as opposed to duties of his other roles, and 293.6 of those hours were for extraordinary services.

The court's specific rulings were:

1. Because of the complexities of the fee schedule and the court's conclusion that the testator never understood those complexities, and because of the difficulty in justifying fees for

---

[10]Although there is some indication in the briefs that the directors were paid $3000 per month, the testimony shows that they received $125 per hour for their services. They invoiced FWC for amounts over the $3000 monthly total. The amounts set out above were taken from a chart prepared by the beneficiaries. Appellants were questioned about the figures and did not dispute them.

[11] Those fees are not in dispute. Also not in dispute, and we think not fairly attributable to Mr. Pursell's fees for purposes of this discussion, is the payment to Mr. Pursell's firm for their successful work in the wrongful death action.

"extraordinary services" as executors in view of the other fees charged, the court denied that portion of the fee request for extraordinary services.[12]

2. The percentage fee schedule type of arrangement contemplates the executors will complete the administration of the estate. Because Mr. Pursell and Mr. Whisenant resigned before the estate was settled, application of the percentages in the fee schedule was not practical. For that reason, and because of the lack of independent advice to the testator regarding fiduciary compensation, the court determined the fee schedule was inapplicable and refused to award fees using that schedule.

3. In response to the beneficiaries' challenge to the attorney's fees of $3000 per month paid to Mr. Pursell for services to the corporation, the court determined that the monthly retainer fee arrangement was clearly unreasonable because Mr. Pursell, as director, was the client as well as the attorney, because Mr. Pursell was also receiving a director's fee, and because Mr. Pursell's firm was paid for legal services outside the retainer. The court denied the entire retainer fee amount and required repayment of any amount exceeding "whatever else he's entitled to." Based upon time records for hours actually spent by Mr. Pursell in providing legal services to FWC, that amount was determined to be the $70,625 requested by the beneficiaries as exceeding the value of the services rendered.

The court also made clear it was not disturbing the previously awarded interim fees, but held that the $50,000 each of the co-executors received pursuant to that agreed order "would be the entirety of their co-executors' fee."

## II. The Trial Court's Authority Over Executor and Trustee Fees

We begin our analysis with discussion of the general framework for consideration of requests for compensation for executor and trustee services. Generally, executors are entitled to reasonable compensation for their services and to payment for reasonable expenses incurred in good faith for the necessary benefit of the estate. *In Re Estate of Wallace*, 829 S.W.2d 696, 700-01 (Tenn. Ct. App. 1992); *see* Tenn. Code Ann. § 30-2-606 (1996). The determination of reasonableness is left, in the first instance, to the discretion of the trial court, which is to make that determination in light of all the relevant circumstances. *Id*. at 701; *In Re Estate of Griffith*, 452 S.W.2d 895, 902 (Tenn. Ct. App. 1969). Thus, where the will is silent regarding compensation for an executor, "the executors shall be credited with a reasonable compensation" as determined by the court. *In Re Estate of Perlberg*, 694 S.W.2d 304, 307 (Tenn. Ct. App. 1984) (quoting *Leach v. Cowan*, 125 Tenn. 182, 195, 140 S.W.1070, 1074 (1911)).

---

[12]The court found that Mr. Wakefield had not received an explanation of "what extraordinary services are or how they would be computed or how much they might be" and that the testator did not understand that aspect of the fee schedule, The trial court later stated, "But I feel strongly that, based upon the evidence I've heard for eight days, that no one was able to explain to Lou Wakefield what that NationsBank fee schedule really meant."

Where, however, the testator has established the compensation of the executor, generally our courts will give effect to the testator's intent to the extent it is ascertainable.

In Tennessee and in virtually every other jurisdiction that has addressed the issue, where a will specifies that an executor is to receive a certain amount as compensation, or no compensation, for serving as an executor, he, by accepting the appointment, binds himself to the will's terms.

*In Re Estate of Perlberg*, 694 S.W.2d at 306.[13]  This rule is based upon the paramount importance given to the testator's intent.  In Tennessee,

"[t]he cardinal rule for interpreting and construing a last will and testament is the ascertainment of the intent of the testator. That intent, when known, will be given effect unless prohibited by some rule of law or public policy." *In Re Walker*, 849 S.W.2d 766, 768 (Tenn. 1993); *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991). So, the clear intent of the testator will govern unless it is "prohibited by some rule of law or public policy." *Id.*

*Winningham v. Winningham*, 966 S.W.2d 48, 50 (Tenn. 1998).   Our law makes it clear that the testator's intent is "of paramount importance." *Id.*  We must ascertain the testator's intent from the particular words used in the will itself, from the context in which those words are used, and from the general scope and purposes of the will, read in the light of the surrounding and attending circumstances; *Moore v. Neely*, 212 Tenn. 496, 502-03, 370 S.W.2d 537, 540 (1963); *see also Third Nat'l Bank of Nashville v. First Am. Nat'l Bank of Nashville*, 596 S.W.2d 824, 828 (Tenn. 1980).

Based on these general principles, as well as more specific authority from other jurisdictions, Appellants assert that the trial court was required to approve the requested additional fees because the testator established the compensation for the executors in the will.  In essence, they argue that the court had no authority to inquire into the reasonableness of the fees or to substitute its judgment of reasonable compensation for that of the testator.

Even assuming that Appellants' interpretation of the general rule is correct,[14] we do not believe that rule prohibited the trial court from making the examination of the facts and circumstances it made.  First, although Appellants equate the will's direction that the executors and trustees "be paid fees equal to those fees customarily charged by NationsBank . . . for estate and trust

---

[13] The primary holding in *Perlberg* was that a will which provides that no compensation will be paid the executor prevails over the statute, and, in that situation,  the executor will not receive even reasonable compensation for necessary services.  *Id.* at 306-307.  "We, therefore, hold the Appellant's contentions that estate representatives are entitled to be paid as a matter of law, even where the will provides to the contrary, is without merit." *Id.  Perlberg* did not involve a situation where the executor asserted entitlement to payment under the will regardless of reasonableness.

[14]See footnote 13.

administration services" to language adopting the fee schedule, there was affidavit testimony[15] to the effect that bank trust departments customarily depart from their printed fee schedules and negotiate other fee arrangements where large estates are involved.[16] A probate court has authority to determine the intent of the testator and, therefore, to examine whether the testator's words "customarily charged" indicated an intent to adopt the fee schedule per se.

Second, even if the testator intended to adopt the fee schedule, that schedule is subject to interpretation, particularly on the issue of what constitutes "extraordinary services" allowing charges in addition to the standard percentage fee. The trial court determined that the testator was not fully and independently informed about the meaning of that provision of the schedule. The probate court's responsibility to interpret and apply the testator's intent required the court to inquire into the nature of "extraordinary services" and the types of services provided by Appellants herein in their various roles as well as their compensation for those services. In fact, Appellants maintained at the beginning of the hearing that the court's only role was to determine whether extraordinary services had been performed, and the extent of compensation appropriate for such services.

The executors claimed hourly fiduciary fees for "extraordinary services" under the fee schedule while at the same time performing other professional services for the estate and the company and receiving compensation for those services. Thus, fiduciary services and professional services and advice were being provided by the same people, and questions of whether particular services were being provided as a fiduciary or as a professional were being answered, in the first instance, by those same people. Without court review, there would be no independent judgment regarding those answers. Because fiduciaries owe a duty of loyalty to the estate and a duty of good faith dealing to the beneficiaries, *In Re Estate of Wallace*, 829 S.W.2d at 705, the court may inquire into the exercise of the fiduciaries' discretion.

---

[15]Otis Goodin, NationsBank Vice President and trust officer, confirmed his prior affidavit testimony stating, "the fee schedule is intended by NationsBank as the fee to be charged. However, it would not be unusual in estates of $5,000,000 or more that the amount based on the fee schedule would be negotiated and fee concessions made based on circumstances where appropriate." Additionally, there is an affidavit of T. Richard Travis, a former trust officer and vice president of NationsBank and its predecessors, C&S Sovran Bank and Commerce Union Bank, stating, "it was my experience at NationsBank (and its predecessor banks) that in setting fees for very large estates ($10,000,000 or more in gross assets), it was not unusual for the executors' fees to be negotiated with the beneficiaries using the published fee schedules as a guideline. In those cases the Bank would consider making concessions and reducing fees in certain areas as seemed appropriate under the circumstances." Finally, M. Kirk Scobey, Jr., Executive Vice President and Senior Trust Officer of Equitable Trust Company, submitted an affidavit to the same effect.

[16]In addition, a guardian ad litem for one of the minor beneficiaries pointed out another issue raised by the affidavits, stating:

So if there had not been a conflict of interest, the attorney would have gone to NationsBank and said, "What would you have settled this estate for," and he would have gotten a written statement. And I think it would be less than that, and I think we have affidavits here today that show this is true.

Third, the trial court was asked to apply the fee schedule, which Appellants argued was the intent of the testator, to a situation unforeseen by the testator: resignation of the co-executors before administration of the estate was complete.[17]  The fact that the trial court encouraged that resignation, as the court candidly acknowledged, does not alter the consequence.

> Where a trustee ceases to be trustee before he has completed the administration of the trust, he is not entitled to the full compensation to which he would be entitled if he had fully administered the trust. . . .  In such case, the court will award to the retiring trustee or his estate such compensation as is reasonable under all the circumstances for the services that he has performed . . . .
>
> In the exercise of its discretion in determining the amount of compensation to be paid to a trustee who has ceased to be trustee before the administration of the trust is completed, the court may consider how nearly the trustee has completed the administration of the trust, what services he has rendered, and what services remain to be rendered. . . .
>
> There are numerous cases in which the courts have applied the rule that the trustee who has ceased to be trustee without having fully administered the trust is entitled to such compensation as is **reasonable under the circumstances.**

AUSTIN WAKEMAN SCOTT & WILLIAM FRANKLIN FRATCHER, THE LAW OF TRUSTS § 242.11, at 311-12 (4th ed. 1988) (emphasis added).

Similarly, when an executor resigns, and that resignation is approved by the court, the court will order settlement by the executor.  Tenn. Code Ann. § 30-1-112.  Such a settlement is "imperative."  2 JACK W. ROBINSON, SR. & JEFF MOBLEY, PRITCHARD ON THE LAW OF WILLS AND ADMINISTRATION OF ESTATES § 620, at 139 (5th ed. 1994).  Any settlement includes approval of fees to the resigning executor. Where an executor performs partially, compensation should be set proportionately or on a quantum meruit basis.  6 WILLIAM J. BOWE & DOUGLAS H. PARKER, PAGE ON THE LAW OF WILLS § 57.14, at 359 (3d ed. 1962).  We agree with the trial court that the resignation of the co-executors and co-trustees before completion of administration of the estate or settlement of the trust authorized the trial court to determine and award reasonable fees for executor and trustee services provided prior to resignation regardless of the method of compensation established in the will.

## II.  Confidential and Fiduciary Relationships

While we find the trial court's inquiry into the reasonableness of compensation received and requested by Appellants to be justified on the bases set out above, it is apparent that the heart of the trial court's ruling rests in another set of principles.  The trial court's findings and the inquiry

---

[17]The will made no provision for successor executors or trustees.

preceding those findings were based, primarily, on the court's concern with the multiple roles filled by Appellants and with Appellants' relationships to the testator, the corporation, and the estate. Those roles and relationships justify the trial court's examination of the reasonableness of the request for additional fees.

## A. Relationships with Testator

While we find no Tennessee law precisely on point with the facts before us,[18] we find persuasive, in light of Tennessee authority in other situations, discussed below, the holding in *Andrews v. Gorby*, 675 A.2d 449 (Conn. 1996). In that case, the drafter of the testator's will and its codicils was named executor and trustee. Codicils provided for the executor's compensation as follows: "the executor . . . shall be entitled to compensation in accordance with fees then payable for Estate Settlement services as published by said UNION TRUST COMPANY in its then effective Personal Trust Fee Schedule . . . ." *Gorby*, 675 A.2d at 452. This fee schedule, which was similar to the schedule relied upon by Appellants in the case before us, calculated the executor's fee as a percentage of the estate's valuation for federal estate tax purposes. The drafter admitted that he had not discussed the potential magnitude of his executor's fee with the testator. After the testator's death and the administration of the estate, the drafter "claimed the full executor's fee pursuant to the Union Trust schedule." *Id.* at 453. When the probate court declined to award the drafter the full amount he sought, the appellate courts were faced with the issue we presently grapple with: whether the probate court was "bound by the direction of the testator in a will prepared by the named executor." *Id.* The *Gorby* court answered that question in the negative. It reasoned:

> We begin our analysis with the fiduciary relationship between the lawyer who drafts the will and the testator. This relationship falls within the attorney-client sphere, and thus raises the concerns typically found in that area. "The judicial system has a significant interest in regulating attorneys and the attorney-client relationship. . . . In so doing, courts have been mindful that the relationship between an attorney and client must involve personal integrity and responsibility on the part of the lawyer and an equal confidence and trust on the part of the client. . . . The relationship between an attorney and his client is highly fiduciary in its nature and of a very delicate,

---

[18]The cases Appellants cite, which emphasize the importance of the testator's intent regarding the amount of compensation executors receive, do not involve situations where the benefit of a specified fee arrangement goes to the attorney who drafted the will and is also acting as an executor and director of a corporation which is the major asset of the estate. *See, e.g., In re Estate of Loutsion*, 496 A.2d 1205 (Pa. Super. 1985). The authorities the beneficiaries cite for the proposition that the probate court may examine executor's fees for reasonableness do not involve situations where the will states the method for calculating the fees. *See e.g., Estate of Cuneo*, 475 S.W.2d 672 (Tenn. Ct. App. 1971) (no provision in will setting executor's compensation); *In Re Estate of Griffith*, 452 S.W.2d 895 (Tenn. Ct. App. 1969) (same); *Young v. Phillips*, 93 S.W.2d 634 (Tenn. 1936) (same); *In re Hick's Estate*, 510 S.W.2d 263 (Tenn. Ct. App. 1972) (there was no will). *Underwood v. United States*, 407 F.2d 608, 610 (E.D. Tenn. 1969), is distinguishable because in that case the executors were permitted to renounce the compensation provisions of the will and accept the statutory fee. This was because the will "was not susceptible of reasonable interpretation." *Underwood*, 407 F.2d at 610. The executors conditioned their appointment on abrogation of the testator's compensation limitation.

exacting, and confidential character, requiring a high degree of fidelity and good faith."

**This fiduciary relationship has always demanded a high degree of scrutiny.** For example, we have held with respect to the attorney-client relationship in general that "[p]roof of a fiduciary relationship therefore imposes a twofold burden upon the fiduciary. Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof . . . by clear and convincing evidence. . . ."

. . . While these events [surrounding the will preparation] may reflect a well placed trust, and even though in this case the plaintiff assumed these fiduciary duties against his wishes at the testator's insistence, **the fiduciary relationship is the overriding consideration**.

Further, although ostensibly the plaintiff was not a beneficiary under the will, compensation in excess of that which is reasonable is, in the words of the Superior Court, **"the functional equivalent of a bequest to the plaintiff."** If the testator had wanted to make such a bequest to his attorney who drafted the will, he would have so provided in the will. Therefore, we conclude that the testator **intended to provide a measure of reasonable compensation for the executor**, and not a bequest.

**We conclude that, as a matter of public policy, an attorney who drafts a will that names the attorney as executor and contains a fee schedule for his compensation as executor is limited to reasonable compensation, irrespective of the schedule.** We note, however, that a testator may have a reasonable expectation that such a fee schedule establishes a maximum limit on executor's fees. Therefore, a reasonable fee may not exceed the amount provided in such schedule. Further, the burden rests on the attorney to prove the reasonableness of the compensation requested by a preponderance of the evidence.

*Gorby*, 675 A.2d at 453-54 (emphasis added) (citations, parentheticals and footnotes omitted).

Neither the conclusion nor the language used by the *Gorby* court is new to Tennessee jurisprudence.

Owing to the confidential and fiduciary relation between an attorney and his client, and to the influence of the attorney over his client, growing out of that relation, Courts of law, and especially of equity, **scrutinize most closely all transactions between an attorney and his client**. To sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which

-16-

is (sic) would have been his duty to give if he himself had not been interested and that the transaction was as beneficial to the client as it would have been had the client dealt with stranger.

*Waller, Lansden, Dortch, & Davis v. Haney*, 851 S.W.2d 131, 131-32 (Tenn. 1992) (quoting *Hutchinson v. Crowder*, 8 Tenn. Civ. App. 114, 119 (1917)) (emphasis added).

An attorney enjoys a confidential relationship with his or her client which triggers judicial scrutiny for fairness of a transaction wherein the client bestows a benefit on the attorney. *Hager v. Fitzgerald*, 934 S.W.2d 668, 671 (Tenn. Ct. App. 1996). Similarly,

We are of the opinion that the relationship between an accountant and his employer is analogous to the relationship between an attorney and his client. It is highly fiduciary in its nature and of a very delicate, exacting, and confidential character, requiring a high degree of fidelity and good faith. It is purely a personal relation, involving the highest personal trust and confidence.

*Federal Ins. Co. v. Arthur Anderson & Co.,* 816 S.W.2d 328, 330 (Tenn. 1991) (citations omitted).[19] A party who manages the financial affairs of another has a confidential relationship with that person. *Nicholas v. Wright*, 42 Tenn. App. 241, 245, 301 S.W.2d 540, 542 (1956).

It is well settled law in Tennessee that where the facts show "the existence of a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). Therefore, the existence of a confidential relationship between the testator and his attorney and accountant at the time the will was drafted and executed, combined with the appointment of the attorney and accountant as fiduciaries created a situation which authorized the trial court to inquire into the compensation of the fiduciaries who were claiming the benefit of a will provision setting compensation.

The presumption arising from a beneficial transaction between parties in a confidential relationship can be rebutted, and fairness of the transaction shown, with proof that the donor received independent advice. *Hogan v. Cooper*, 619 S.W.2d 516, 519 (Tenn. 1981). Independent advice means that the advisor must be competent to provide the advice and so disassociated from the interests of the party receiving to benefit to be able to advise impartially. *Turner v. Leather*, 191 Tenn. 292, 297, 232 S.W.2d 269, 271-72 (1950). Thus, the trial court's references in the case before

---

[19]The record shows that Mr. Whisenant, the testator's accountant, also advised the testator regarding the executor's fees. Although Mr. Whisenant did not actually draft the will, the record shows that he had agreed to be an executor and was enmeshed in advising the testator about the appropriate method of determining the executor's fees, including fee schedules used by institutional trustees.

us to the absence of independent advice indicate that the trial court was concerned with the presumptions arising from transactions between those in a confidential relationship.

Appellants adamantly maintain there was no allegation of undue influence in the making of the testator's will,[20] which we interpret as an argument that the issues raised by the existence of a confidential relationship were not properly before the court. We respectfully disagree. We are aware that the cases involving a confidential relationship between a testator and someone who benefits from a will generally involve the question of whether the specific provision of the will was the product of undue influence. However, we think the underlying principles and policy concerns justify the court's scrutiny of the consequence and effect of the testator's disposition of a benefit to a person who had a fiduciary responsibility to the testator at the time of making of that disposition. As the Connecticut court said in *Gorby*, and as Tennessee courts have said, it is the fiduciary relationship which is the overriding consideration and which demands a high degree of scrutiny from the courts. Therefore, although the trial court made no finding that the testator was unduly influenced in his decision to include the compensation provision in his will, the court was within its authority to scrutinize the transaction and its result to determine their fairness and reasonableness, including the effect of application of the fee schedule to the estate.

In *Petty v. Privette*, 818 S.W.2d 743 (Tenn. Ct. App. 1989), this court determined that the presumption arising from a confidential relationship attached to a clause "beneficial to" the attorney who drafted the will at issue. *Id*. at 746. That beneficial clause relieved the executor, who was the drafting attorney, from liability for any act or omission as executor or trustee. Because the trial court had found that the exculpatory clause was unenforceable as a matter of law, this court remanded the case to give the attorney the opportunity to present proof to rebut the presumption and for further evidence "as to undue influence, overreaching, or any abuse of confidential relationship," with the burden on the attorney.[21] *Id.* at 748. The court held that an attorney may benefit from an exculpatory clause, in a will drafted by himself or his firm, if the attorney proves there was no overreaching,

---

[20]We note the beneficiaries raised the issue in their response to the petition for additional fees.

[21] In *Petty v. Privette*, No. 03A01-9102-CH-00084, 1991 WL 200252, at *3 (Tenn. Ct. App. Oct. 9, 1991) (no Tenn. R. App. P. 11 application filed), this court later held

> Because of the confidential relationship between the drafting attorney and the testator, there is a rebuttable presumption that the clause beneficial to the attorney was the result of the attorney's undue influence on the testator, and the burden of rebutting this presumption rests with the attorney. In the instant case, the trial court held that this burden of proof must be met by clear and convincing evidence . . . . Although the clear and convincing standard has been relaxed in some circumstances, we are convinced that the clear and convincing standard of proof is the better rule in situations where an attorney in his capacity as executor may benefit from an exculpatory clause which he or a member of his firm has drafted.

*Id*. at *4 (citations omitted).

undue influence, or abuse of the fiduciary relationship. *Id.* at 747-48. The court also quoted with approval the following language from a Massachusetts case:

> Any transaction between an attorney and his client when called in question must be subjected to careful scrutiny and the burden is upon the attorney to prove that any influence over the client which might be presumed to have arisen out of the relationship was neutralized by independent advice given to the client or by some other means so that there was no overreaching of the client and no abuse of confidence.

*Id.* at 747 (quoting *Barnum v. Fay*, 69 N.E.2d 470, 473 (Mass. 1946).

We think the provisions of the testator's will herein were beneficial to Appellants in the same way the exculpatory clause was beneficial to the executor in *Privette*. Appellants have taken the position that insertion of the method of compensation removes executor fees from a reasonableness analysis by the court, certainly a benefit to executors.[22] In addition, they asserted that any beneficiary who sought to question the award of fees under the fee schedule was subject to disinheritance under the *in terrorem* clause. They are, consequently, hard pressed to deny an intended benefit from the language in the will. In addition, like the court in *Gorby*, we find no intent by the testator to pay the co-executors more than an amount that is reasonable.

Finally, it is well-settled that

> If the settlor fixed a rate of compensation for the trustee which was extravagantly high, and if the trustee was influential in obtaining the insertion of this clause in the instrument, the court will require the trustee to prove the utmost fairness in his negotiations on the subject. Unless the trustee could establish that there was no undue influence, fraud, or duress upon the settlor, and that the settlor acted independently, and after full disclosure of his rights and of the legal situation about compensation, the court will set aside the provision and require the trustee to be content with a sum fixed by the court or with the statutory fee.

BOGERT, THE LAW OF TRUSTS AND TRUSTEES, § 976, at 145 (2d ed. Rev.) (1983).

These authorities, and the principles underlying them, make it clear that the trial court had the authority and responsibility to inquire into the compensation provision and into the reasonableness of the requested compensation. We agree with the trial court that the burden of establishing the fairness of the compensation provision, or the fairness of the compensation itself,

---

[22]By their position as co-trustees, they are also a majority of the board of directors of the corporation which is the principal asset of the trust. In that role, they were able to make hiring and compensation decisions for professional services for the corporation. As a majority of the co-executors, they were able to make similar decisions regarding professional services for the estate.

in view of the totality of circumstances, lay with the fiduciaries claiming benefit from the will. We affirm the trial court's decision to award Appellants only reasonable fees.

## B. Fiduciary Relationships After Death of Testator

In addition to the confidential relationships existing between the testator and his attorney and the testator and his accountant at the time the will was drafted, Appellants assumed additional fiduciary responsibilities upon probate of the will. First, they were appointed co-executors of the estate and co-trustees of the testamentary trust. Under principles well-established under Tennessee law:

> Executors, as fiduciaries, owe a duty of undivided loyalty to the estate and must deal with the beneficiaries in the utmost good faith. *Mason v. Pearson*, 668 S.W.2d 656, 663 (Tenn. Ct. App. 1984); *In re Cuneo's Estate*, 63 Tenn. App. 507, 515, 475 S.W.2d 672, 676; *Baker v. Baker,* 24 Tenn. App. 220, 240, 142 S.W.2d 737, 750 (1940). Part of this duty includes incurring only those expenses that are reasonably necessary for the proper administration of the estate.

*In re Estate of Wallace*, 829 S.W.2d at 705 (citations updated).

> Similarly,

> The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty. This duty is imposed on the trustee not because of any provision in the terms of the trust but because of the relationship that arises from the creation of the trust. A trustee is in a fiduciary to the beneficiaries of the trust. . . . In some [fiduciary] relations the fiduciary element is more intense than in others; it is peculiarly intense in the case of a trust. It is the duty of a trustee to administer the trust solely in the interest of the beneficiaries. He is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries.

SCOTT & FRATCHER, *supra*, § 170, at 311.

A trustee must exercise his or her discretion in good faith. *Krug v. Krug*, 838 S.W.2d 197, 201 (Tenn. Ct. App. 1992). "The trustee's discretion must be exercised in a reasonable way. 'He must do what his honest, disinterested, judgment approves or ought to approve.'" *Alexander v. Nelson*, 825 S.W.2d 106, 108 (Tenn. Ct. App. 1991) (quoting *Cansler v. Unknown Heirs of Chairs*, 35 Tenn. App. 631, 635, 250 S.W.2d 579, 581 (1952)).

Prior to his death, the testator was the sole shareholder, sole director, president, and chief executive officer of Feldkircher Wire Fabricating Company, Inc. By the terms of his will, his residuary estate, including his shares in FWC, became an asset of the Wakefield Family Trust. The

trust was to be terminated within eleven years of the testator's death, and the trust assets distributed to the beneficiaries, except that portion for the benefit of the minor beneficiaries. Thus, the company was the major asset of the trust created under the will.[23] The will further provided:

> I direct the co-trustees to continue to operate the corporation known as Feldkircher Wire Fabricating Company, Inc. I direct the co-trustees to designate Judith Wakefield Sandlin, R.H. Pursell and Robert V. Whisenant as the Board of Directors of the corporation. Furthermore, I specifically authorize the directors to sell the corporation if the directors in their absolute and unlimited discretion deem it to be financially advisable.

Thus, the will directed the co-trustees to operate the company. The fact that they also served as directors of the company does not remove their actions from scrutiny by the court with jurisdiction over the estate. The probate court had jurisdiction over appointment and removal of the co-trustees, Tenn. Code Ann. § 35-1-101, and over examination of an accounting by a resigning trustee, Tenn. Code Ann. § 35-1-107.

The various roles assumed by Appellants, and potential compensation for each role, created a situation wherein the fiduciary was required to make decisions which could potentially benefit the fiduciary. As the trial court observed, the attorney-client relationship between Mr. Pursell and FWC was fundamentally changed by the death of Mr. Wakefield. As a director, Mr. Pursell was the client, and as a fiduciary had to exercise independent judgment in the selection and compensation of legal service providers. The same is true regarding Mr. Whisenant and accounting services.

Because of the fiduciary duties imposed upon Appellants by virtue of their status as co-executors, co-trustees, and directors, the court had the authority to closely scrutinize any transaction wherein the fiduciary decided to hire himself. With regard to transactions between an attorney and client, Tennessee courts will "scrutinize most closely" all such transactions. *Waller, Lansden, Dortch, & Davis*, 851 S.W.2d at 131.

In this situation, the court has authority to examine the fiduciaries' performance and its consequences to the estate and the beneficiaries. Additionally, the burden of establishing fairness in the transactions properly falls to the fiduciary, especially where, as here, the beneficiaries raise the issue of the reasonableness of the overall compensation.

C. Court Examination of All Fees Received
by Fiduciaries for Reasonableness

For all the reasons set out above, the probate court had authority to examine the fees paid to, as well as requested by, the fiduciaries whose appointment and resignation were approved by the

---

[23]An audit report indicates the shares of stock were held by the Estate of M.L. Wakefield; the will would indicate they were held by the Wakefield Family Trust. In either event, the co-executors and co-trustees had the same duty regarding the management of the asset.

court. This examination did not require a finding of undue influence or any breach of duty. No such findings were made, and our holding does not carry any implication there was such conduct. We merely hold that in the factual circumstances presented, the fees to be received by co-executors and co-trustees of a testamentary trust are subject to the scrutiny of the probate court which has the authority to oversee the performance of those fiduciaries. The probate court determined the fiduciaries herein were entitled to reasonable compensation, and we affirm that holding.

### III. Reasonableness of Fees

### A. Executor and Trustee Fees

Having determined that the trial court acted within its authority in examining the request for additional fees and in awarding reasonable fees, we now review the court's determination as to the amount of reasonable fees. When a court sets a reasonable fee for a trustee, it should take into account "the size of the trust, the nature and number of the assets, the income produced, the time and responsibility required, the expertise required, any management or sale of real estate and closely held business interests, any involvement in litigation to protect the trust property, and other relevant factors." Tenn. Code Ann. § 35-1-112. Similarly, reasonable compensation to an executor should be fixed with reference to the entire estate and services. *Loftis v. Loftis*, 94 Tenn. 232, 240-241, 28 S.W. 1091, 1093 (1895). Among the circumstances relevant to the reasonableness of fees and expenses to be charged against an estate are the extent of the executor's responsibilities, the nature of the services rendered, the promptness and adequacy of the services, and the value of benefits conferred. *In Re Estate of Wallace*, 829 S.W.2d at 701. However, all relevant circumstances should be considered. *Id.*

We interpret the trial court's rulings herein as the result of an examination of all fees and compensation made to Appellants as well as those included in the request for additional fees. Although Appellants contend otherwise,[24] we are in agreement with the trial court that it is appropriate to look to the total compensation paid to Appellants, in all the roles they assumed pursuant to the will. Such additional roles and the compensation received therein are circumstances relevant to the reasonableness of compensation for services rendered in one of the roles. This is especially true where, as here, the decision of how to charge the services (i.e., as a duty of which role) is left to the individual seeking compensation.

As a general rule, "a person who acts both as executor and as trustee is entitled to such compensation as is reasonable in view of all the duties that he performs." SCOTT & FRATCHER, *supra,* § 242.9 at 305 (4th ed. 1987). Similarly, "[w]hen an attorney serves as personal representative [to an estate], he may either employ other counsel or furnish his own professional services. Where he furnishes his own services and saves the estate counsel fees by diligent and efficient legal services to himself, he should be allowed greater compensation than that ordinarily

---

[24]Appellants assert that any fees paid to them for their activities as directors of FWC or professional advisors to FWC or the estate "are irrelevant to the determination of the Executors' fee owed pursuant to the NationsBank fee schedule."

granted to an executor employing other counsel, but he can be paid only in his capacity as executor, not in both capacities." Robinson & Mobley, *supra,* § 863, at 541 (citing *Holding v. Allen*, 150 Tenn. 669, 266 S.W. 772 (1924) (disapproving in part *Fulton v. Davidson*, 50 Tenn. 614 (1871)).

In *In Re Estate of Perlberg*, 694 S.W.2d at 308, this court determined that the co-executors were not entitled, because of a specific provision in the will, to compensation for their services as co-executors. However, the co-executors were entitled to expenses incurred in administration of the estate, including accounting and legal services performed by others on behalf of the estate. The co-executors were an accountant and a lawyer, and members of their firms had performed services for the estate. The problem, according to this court, was that it was not possible from the record to differentiate between those services rendered as executor, or which should have been rendered as executor, and those which were strictly accounting or legal services. "At least to the extent that [a law firm associate], and others, performed, and charged for, executorial services that were the obligation of [the co-executor], the attorneys' fees paid by the estate have been unreasonable." *Id.* at 309. We remanded for hearing and determination as to what services were or should have been rendered by the co-executors as part of their duties as co-executors. For those, no fees were to be allowed. For 'strictly' legal or accounting services performed by the co-executors' firms, reasonable fees were allowable as an expense of administration. *Id.* We interpret this holding as indicating that an inquiry is required into the type of services rendered and the classification of each.[25]

Appellants assert that during the thirty month period from the death of the testator until the resignations of Appellants, Mr. Pursell spent 998.6 hours performing his duties as a director of FWC and that Mr. Whisenant spent 1,001.2 performing those duties. The record indicates that Mr. Pursell was paid $135,232 for his services as director and that Mr. Whisenant was paid $123,684 as director.

With regard to professional services to FWC, Mr. Whisenant's firm was paid $82,610 after the testator's death. Appellants assert these fees were not for Mr. Whisenant's time, but for his staff. Similarly, they assert that any work done personally by Mr. Whisenant was not charged to the estate, but that the $55,113 charged to the estate was for accounting work performed by other members of his firm.

The record shows that Mr. Pursell collected $90,000 at $3,000 per month in retainer fees from FWC in the thirty months following the testator's death. In addition to the retainer, members of Mr. Pursell's firm were paid $9,792 for work for FWC. Mr. Pursell asserts that his law firm performed some legal work for the estate, billing the time of his partners and associates at $125 per hour. They were paid $26,683 as attorneys for the estate prior to the firm's resignation. Mr. Pursell asserts he did not charge the estate for his own legal work for the estate, including such work in his timekeeping as an executor.

---

[25]Appellants assert that they carefully segregated the time they spent in each role and kept detailed records of that time.

Mr. Pursell claimed he spent 475.9 hours on his work as co-executor. Of that, he testified that 239.7 hours were spent on extraordinary services, including legal work and work on the ESOP plan. Mr. Whisenant claimed 293.6 hours spent on extraordinary services, out of a total of 496.3 hours on co-executor duties.

The trial court refused the request for payment for extraordinary services. Appellants offered affidavit testimony which described those services considered by NationsBank to be "extraordinary" as including "continuation of sale of a closely-held business, involvement in litigation, tax controversies, ancillary administration, or other responsibilities involving non-probate assets." Appellants identified the services they categorized as extraordinary as filing tax returns, obtaining asset valuations, revising tax projections, obtaining loans to pay estate taxes, reviewing the estate tax return, meeting about and handling real estate sales, generating cash flow analyses, dealing with the beneficiaries and their attorneys, and conferring with each other on these issues. The beneficiaries introduced affidavits from bank trust officers that such services were ordinary activities expected of an executor, not "extraordinary services." Appellants argue, in part, that administration of the estate was complicated by the actions and animosity of the beneficiaries; therefore, they assert "extraordinary services" were required.

With regard to Appellants' specific requests based on the "ordinary services" portions of the NationsBank fee schedule, the beneficiaries raised specific objections. First, Appellants' request included $120,902 based on application of the fee schedule to the value of the gross estate; the beneficiaries argue that the amount is incorrect because it is based upon an incorrect statement of the estate's gross assets for federal tax purposes. When applied to the proper amount, computed by reducing the value of the two sole proprietorships[26] owned by testator by associated debt, Appellants assert that application of the percentages on the fee schedule would result in fees of $88,502.[27]

Similarly, the beneficiaries challenge the reasonableness of the $161,889 requested by Appellants on the basis of 6% of the estate's income during the 30 month period of their administration. The beneficiaries argue that the income stream in this estate "is merely an internal transfer from one Estate pocket (the Company's) to another Estate pocket (the proprietorships) - both owned by the same entity - the Estate." Essentially, the estate owned real property and equipment which it leased to FWC, and FWC paid rent to the Estate, with all associated expenses and upkeep, including real estate taxes, being the responsibility of FWC. Since Appellants were also directors of FWC, for which they received hourly compensation, the beneficiaries characterize this request for fees based on income from FWC's rental payments as "double dipping."

Additionally, Appellants requested $32,820 for fees based on the sale of some real estate owned by the estate. The beneficiaries especially object to the portion of this claim that is attributable to a sale which the court disapproved. The beneficiaries also point out that Appellants

---

[26]The testator owned two sole proprietorships, MLW Company and MLW, Ltd., which owned land and buildings leased to FWC and owned machinery and equipment also leased to FWC.

[27]We note that amount would be divided by three, allowing each of Appellants $29,500.

have claimed time spent on real estate sales as "extraordinary services." Further, they assert, the value of the real estate was included in the gross estate upon which the percentage fee request was based.

After hearing evidence and arguments over a number of days, the trial court decided that Appellants were entitled to reasonable fees, refused to award additional fees on the basis of the NationsBank fee schedule, and determined that the $50,000 previously awarded each of Appellants was reasonable in light of all the circumstances. With regard to the reasonableness of the request for compensation for extraordinary services, the trial court found:

> Combine the extraordinary services with the fact that you've got – and I'm not saying this is improper – but you've got what I would say double-dipping: you have executors' fees, directors' fees, you have other fees, it's just so hard to accept the fact that then there can be a third or fourth or fifth category of income called "extraordinary services," so I have a serious problem with that.
>
> * * *
>
> . . . and because I find it difficult to justify an executors' fee and a directors' fee and some other fee for extraordinary services, I'm denying both Mr. Pursell's and Mr. Whisenant's request for those fees that they deemed extraordinary services.

With regard to Appellants' request for fees in accordance with the percentage calculations in the NationsBank schedule, the trial court found that percentage fee schedules are not appropriate where the executor resigns before completion of administration of the estate, stating, "if you don't get to the finish line, then the percentage agreements just don't work," because it is impractical to attempt to apply percentages proportionally when there are sequential executors.[28] Consequently, the court refused to award fees based on the NationsBank schedule.

Having declined to award fees based on either the percentage calculations of the NationsBank fee schedule or for "extraordinary services" mentioned in the fee schedule, the court determined that Appellants were entitled to reasonable fees, stating, "I truly believe that Mr. Pursell and Mr. Whisenant benefitted the estate, benefitted the beneficiaries, benefitted the corporation with their advice and counsel and service, and that they're entitled to some reasonable compensation for that." The trial court determined that $150,000 was reasonable compensation to the co-executors for their services in that role, based on all the relevant circumstances.

---

[28]The trial court also stated, "Number one, that settlement works because a lot of times most of the work is done in the first 90 days and the last 90 days, and you're kind of coasting in the middle, whether that's one year or two years or three years. That, combined with the fact that Mr. Pursell and Mr. Whisenant did resign . . . in fairness to Mr. Pursell, so that I won't sound like a total hypocrite, I did insist that if he did not voluntarily resign that I would take certain actions, so I don't want to sound like a hypocrite, but I respect the fact that he voluntarily did resign. And I think he made the right decision for a lot of reasons. And I never asked Mr. Whisenant to resign, but Mr. Whisenant, for very valid reasons, as stated on the witnesses stand, I respect his individual choice in that regard."

We review the trial court's findings under Tenn. R. App. P. 13(d) and "will make our own independent determination of the reasonableness of the fees and expenses, giving appropriate deference to the probate court's discretion." *In Re Estate of Wallace*, 829 S.W.2d at 700. We agree with the trial court that application of the NationsBank fee schedule, as Appellants interpreted that application, would result in fees that were not reasonable in light of all the circumstances of this case. We do not imply that payment of executor fees according to a fee schedule is unreasonable. We simply find that the facts herein do not justify payment according to Appellants' interpretation of the application of the schedule.

First, we note that the 236.2 hours performed by Mr. Purcell on "ordinary services" for the estate would be compensated at $445.40 per hour if the fee request based on the NationsBank fee schedule were approved.[29] Similarly, Mr. Whisenant's 238.7 hours of "ordinary services" would be compensated at $440.74 per hour. We find these rates to be unreasonable.[30]

If all of the hours claimed by the co-executors were considered to have been spent on "ordinary services," and none on "extraordinary services," their total request would result in compensation of $221.06 per hour for Mr. Pursell and $211.97 per hour for Mr. Whisenant. On the other hand, if their total services as co-executors were compensated at $125 per hour, Mr. Pursell would receive a total of $59,487.50 for his claimed 475.9 hours, and Mr. Whisenant would receive a total of $62,037.50 for his claimed 496.3 hours. They were awarded $50,000 each.

The trial court determined that Appellants had provided good and valuable service to the estate. Appellants proved the hours spent on co-executor or co-trustee duties. The beneficiaries did not challenge the number of hours. Their main complaint was the classification of some hours as extraordinary services on top of the percentage fee. The trial court made no specific findings regarding the services or time spent which it did not approve. Based on the record before us, we conclude Appellants were entitled to be paid for the hours they documented at a reasonable rate. Therefore, we modify the trial court's award of co-executor and co-trustee fees and award a total of $59,487.50 to Mr. Pursell and $62,037.50 to Mr. Whisenant. Both these amounts include the $50,000 previously awarded to each Appellant. Therefore, Mr. Pursell is entitled to an additional $9,487.50 and Mr. Whisenant to an additional $12,037.50

---

[29]Mr. Purcell's portion of the fee request for other than "extraordinary services" is $105,204 ($315,611 divided by 3 is $105,203.67).

[30]Additionally, as the court noted, the percentage fee applied to the value of the gross estate does not appear to apply equitably to partial administration of an estate or partial handling of a trust. That fee appears to be a one-time charge on principal for "administration of an estate" and is based upon "the market value of all probate assets, as finally determined for Federal Estate Tax Purposes." Thus, it is questionable whether a resigning executor or trustee could claim entitlement to the entire amount even if the fee schedule were applicable.

## B. Fees for Legal Services to the Corporation

Appellants argue that the probate court lacked jurisdiction to order Mr. Pursell to disgorge $70,625 of the attorney fees paid to him by FWC, when that corporation was not a party to this action and did not request such relief. They also argue that because the beneficiaries agreed to indemnify Mr. Pursell upon his resignation, they should hold him harmless in this case. They further assert that even if the probate court had jurisdiction over this issue, no evidence in the record supported its decision that the fees were unreasonable.

The law clearly authorizes the probate court's jurisdiction over this estate.[31] That jurisdiction extended to the testator's property located within this state. *Svoboda v. Svoboda*, 61 Tenn. App. 444, 457, 454 S.W.2d 722, 728 (1969). In this case, that includes the testator's stock in FWC. We disagree with Appellants' argument that FWC, rather than the beneficiaries, was required to contest the attorney's fees Mr. Pursell charged the corporation. The testator's stock was held by the trust for the beneficiaries. FWC was the principal asset of the estate and trust, and its standing and rights are inextricably intertwined with those of the estate, the trust, and the beneficiaries. Further, it was only by virtue of their position as co-trustees that Appellants served as directors of FWC. They were charged, as trustees, with operating the company during the term of the trust. Their fiduciary duties as executors and as trustees authorize the court to examine their dealings with trust assets, including their decisions on hiring and compensating themselves for professional services.

As explained earlier in this opinion (see IIB above), the probate court had authority to examine any fees received by Appellants because (1) their performance as directors was the equivalent of their performance as trustees, and (2) independent court oversight of their arrangements as client (board of directors of FWC) and professional (attorney and accountant) was justified by their decision, exercising their trustee duties, to continue an employment relationship.

The probate court clearly had continuing supervisory jurisdiction over this testamentary trust. *Dattel v. Brekher*, 749 S.W.2d 727, 730 (Tenn. 1988) (administration of trust created to satisfy alimony obligation was to be closely supervised by divorce court). This supervision extended to examination of costs and expenses of administration of the trust. *Id.* (approving Court of Appeals disposition of expense and fee issues in *Dattel v. Brekher*, 1986 WL 8633 (Tenn. Ct. App. Aug. 8, 1986)). While a trustee is entitled to reasonable compensation, based upon a number of factors, Tenn. Code Ann. § 35-1-112, the court is authorized to approve or disapprove compensation, based upon its determination of reasonableness under the circumstances.

A court exercising probate jurisdiction has authority to appoint and remove trustees, Tenn. Code Ann. § 35-1-101 and to examine a resigning trustee's accounts, Tenn. Code Ann. § 35-1-105(2). The court is required to have the accounts of a trustee seeking to resign "examined and passed upon, according to the nature of the case." Tenn. Code Ann. § 35-1-107(a). If the court finds

---

[31]*Howell v. DeLoach*, No. 01A01-9704-PB-00154, 1997 WL 629958, at *2 (Tenn. Ct. App. Oct 14, 1997) (no Tenn. R. App. P. 11 application filed) (defining jurisdiction of Davidson County Probate Court).

a deficiency therein, it may order satisfaction thereof by the trustee. Tenn. Code Ann. § 35-1-107(b). The court has jurisdiction to examine an accounting and order an appropriate remedy to correct any error therein. *Grace Thru Faith v. Caldwell*, 944 S.W.2d 607, 613 (Tenn. Ct. App. 1997). Where improper distributions have been made, the probate court may order refund of the distributions before approval of a final accounting. *Estate of Cuneo v. Union Planters Nat'l Bank of Memphis*, 561 S.W.2d 759, 765 (Tenn. Ct. App. 1977). "To hold otherwise would totally impede the authority of the probate court to preside over the administration of estates." *Id*. Although *Cuneo* dealt with an estate, we conclude the same reasoning applies to the court's continuing supervision of testamentary trusts.

Finally, having appointed the co-trustees, the court had jurisdiction over the trustees in the performance of their duties. *First American Bank v. DeWitt*, 511 S.W.2d 698, 706 (Tenn. Ct. App. 1972). As trustees, Appellants had control of the trust assets, including all the stock in FWC. As trustees, they comprised the majority of the board of directors of FWC, overseeing its operation. While we agree that it is generally true that corporate entities will be recognized as separate entities, *see e.g., Bankers Life Insurance Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 631 (Tenn. 1979), we do not agree that such rule prohibits the probate court from examining fees paid to a trustee, approved in the exercise of trustee duties, from funds of the major asset of the trust. To be entitled to a fee out of the funds of a trust, an attorney must contribute some benefit to the preservation of the trust estate. *Pierce v. Tharp*, 224 Tenn. 328, 338, 455 S.W.2d 145, 149 (1970). The court supervising the trust has authority to make that determination. *Id.* We see no basis for removing that authority from the court because the trust assets consist of stock in a corporation when control of the operation of the corporation has been given to the trustees. We see no benefit to requiring a new and separate lawsuit to recover fees. Because there was ongoing litigation concerning the administration of the estate and the testamentary trust, specifically regarding fees paid to fiduciaries, the probate court correctly exercised its jurisdiction to review all fees paid to the fiduciaries.

As part of their argument that the court was without authority to order disgorgement of the retainer fees, Appellants assert that the issue was not before the court and the beneficiaries had not requested that relief. Having thoroughly reviewed the response to the petition for additional fees, we cannot agree with Appellants' position. That response clearly calls into question "the totality of all fees charged." The response included an attachment detailing amounts received by Appellants in their various capacities, including those received by Mr. Pursell and his firm for legal services to FWC. The response specifically asserts it is not reasonable to separate work done for the estate from work done for the company because "(1) it is the major asset of the Estate, (2) the Co-Executors by the terms of this Will serve as Co-Directors, and (3) there was no independent Board of Directors to provide oversight of the reasonableness or appropriateness of the fees charged by Messrs. Pursell and Whisenant and their respective firms to the Company."

The beneficiaries having raised the issue of the appropriateness of the retainer fee, Appellants were clearly on notice of the issue. Appellants assert, however, that no request for disgorgement for the retainer fees already paid was made, and, therefore, the trial court could not grant that relief, or, as Appellants characterize it, enter a judgment against Mr. Pursell for those fees. We do not agree,

because the trial court was asked to review a request for fees and, in the course of that review, to consider all payments to Appellants "arising out of the administration of the Estate and affairs of Mr. Wakefield." As part of its responsibilities regarding final settlement with resigning fiduciaries, the court was within its authority to examine all dealings between those fiduciaries and the estate, and to approve or disapprove payments made.

Executors have the authority to retain counsel to assist them in administering an estate; however, they are personally liable for the attorney fees until a court approves them. Among claims chargeable to an estate, costs of administration of the estate and "reasonable compensation to the personal representative and his counsel" have first priority. Tenn. Code Ann. § 30-2-317(a). Such costs may be allowed by the court in the executor's settlement if reasonable and incurred in good faith for the benefit of the estate. *In Re Estate of Wallace*, 829 S.W.2d at 700-01. If a court approves the fee, the executor may charge it back against the estate as one of the costs of administration under Tenn. Code Ann. § 30-2-606. *State ex rel. Dahlberg v. American Sur. Co.*, 173 Tenn. 505, 508-09, 121 S.W.2d 546, 547 (1938); *Perlberg v. Jahn*, 773 S.W.2d 925, 926-27 (Tenn. Ct. App. 1989).

In order for attorney fees to be allowed as an administrative expense, they must be shown to be required, *see Vaccaro v. Cicalla*, 89 Tenn. 63, 78-79, 14 S.W. 43, 46-47 (1890), and the services provided must inure to the benefit of the entire estate. *McAdoo v. Dickson*, 175 Tenn. 598, 602, 136 S.W.2d 518, 519. Thus, with respect to the issue of the payment of attorney's fees, a primary question to be determined is whether the services directly benefitted the estate. Those fees not inuring to the estate's benefit will not be allowed. *In re Estate of Wallace,* 829 S.W.2d at 703; *McFarlin v. McFarlin,* 785 S.W.2d 367, 372-73 (Tenn. Ct. App. 1989).

In this regard, it has been stated that "[t]he personal representative cannot bind the estate for payment of a retainer fee but only for services rendered." ROBINSON & MOBLEY, *supra*, § 863, at 540 (5th ed. 1994) (citing *Pate v. Maples*, 43 S.W. 740, 744 (Tenn. Ch. App. 1897)). We interpret this principle as consistent with the requirement that services be shown to be necessary and to have benefitted to estate before the estate can be charged with payment for them. The same rule applies to fees for attorney services to a trust. *Pierce v. Tharp*, 224 Tenn. at 338, 455 S.W.2d at 149. Thus, it is not illogical to require proof that services were actually rendered in return for compensation.

Additionally, while a personal representative may employ counsel for the estate when necessary and proper and pay reasonable compensation for their services out of the assets, "In selecting counsel and contracting liability for their services, the representative must exercise sound discretion and good faith." ROBINSON & MOBLEY, *supra*, § 739, at 340-41. *See State v. Butler*, 83 Tenn. 113, 118 (1885); *see generally, Third Nat'l Bank v. Cohn*, 194 Tenn. 637, 254 S.W.2d 741 (1953). The same rule applies to trustees hiring counsel for trust administration and requires disinterested decision making. *Alexander v. Nelson*, 825 S.W.2d at 108.

The trial court applied these principles. After clarifying that the beneficiaries were not challenging fees paid to other members of Mr. Pursell's firm, the court considered the $3000 per month paid Mr. Pursell on retainer. The court found that although the retainer arrangement was not unreasonable while Mr. Wakefield was alive and made the choice to continue it, "[t]he problem is,

after Mr. Wakefield's death, a lot of things changed. Not only was the client not there anymore, the attorney was really the client after Mr. Wakefield's death." The court also considered the other multiple fees received by Mr. Pursell, and determined that the retainer of $3000 was clearly unreasonable.

The court's judgment ordered Mr. Pursell to repay to FWC $70,625 paid to him as attorney's fees with respect to affairs of the company. The total amount paid to Mr. Pursell had been $90,000; thus, the court awarded him $19,375 for the hours of legal services he actually provided according to Mr. Pursell's time records. Those records indicated he spent 154.6[32] hours in legal services for the company.[33] (During the thirty months preceding testator's death, Mr. Pursell's firm had billed 1230.4 hours of work under the retainer agreement.) We note an additional $9,792 was paid to Mr. Pursell's law firm for services to FWC, suggesting the retainer was for Mr. Pursell's services only.

We agree with the trial court's determination that Mr. Pursell was entitled to fees only for services actually provided. That determination is consistent with authorities requiring that such services be necessary and beneficial to the estate or trust. To the extent the refund resulted in such payment, we affirm.[34]

We are likewise unpersuaded by Mr. Pursell's attempts to characterize the court's order as imposing "liability" or "damages" for which the beneficiaries are obligated to hold him harmless. That agreement is found in the Agreed Order documenting Appellants' resignations. It provides, in pertinent part, "All parties in interest . . . do hereby release, indemnify, and agree to hold harmless R.H. Pursell and Robert V. Whisenant from any and all duties, responsibilities, liabilities and/or obligations of either of them arising out of or in connection with their duties and obligations in each capacity." We disagree that this language prohibits the beneficiaries from seeking the repayment of retainer fees.

The trial court ordered Mr. Pursell to disgorge and repay the monthly retainer he received while he was also receiving payment as a director of FWC, by virtue of his position as co-trustee of the testamentary trust. The trial court exercised its authority to examine management of the assets of the estate, and it found that accepting the retainer fee under the circumstances was unreasonable. The trial court's order to disgorge unreasonable fees already paid does not equate to the type of liability for which the beneficiaries agreed to hold Mr. Pursell harmless.

---

[32]There is a reference to 157 hours in the record, but, again, the discrepancy does not affect our reasoning. Additionally, we note that 154.6 hours x $125/hr. Equals $19,325.

[33]The 154.6 hours of work performed would have been compensated at $582 per hour if the $90,000 in retainer fees were allowed to stand.

[34]A correction of the calculation would appear to be in order.

IV.

On appeal, Appellants vigorously object to statements by the trial court that they characterize as indicating that Appellants' invocation of the *in terrorem* clause was "improper." Appellants assert they invoked the clause upon advice of counsel because they believed the adult beneficiaries were attempting to thwart the testator's intent with regard to compensation of the co-executors. They interpreted the beneficiaries' filings as requesting the court to replace the fee schedule with another method of compensation. They maintain they did not raise the clause to prohibit review of their fees, which was the trial court's interpretation and concern.

The merits of the issues surrounding the beneficiaries' petition for construction and Appellants' response asserting the petition was in fact a will contest which triggered the *in terrorem* clause are not before us.[35] Nonetheless, Appellants argue the legal validity of their position regarding the clause and their duty as executors to raise it. These arguments are presented as justification for their actions because Appellants assert the trial court wrongful punished them for raising the clause.

We do not agree with Appellants' contention. To the extent Appellants think they were punished by the court's determination that it could analyze the fee requests for reasonableness, instead of applying the fee schedule as requested by Appellants, we have found that the trial court had authority to make such inquiry. As thoroughly set out herein, the trial court expressed the basis for its determination on Appellants' request for additional fees, and we have agreed that the court considered appropriate principles. To the extent Appellants think they were punished by the trial court's refusal to award additional fees, we point out the trial court ruled Appellants were entitled to reasonable fees. The fact that we have modified the amount does not indicate the trial court's determination of what amount was reasonable was based on any improper motivation. To the extent they assert the punishment was the court's encouragement of their resignations, the record reflects their voluntary resignation. They have not appealed any rulings by the trial court accepting their resignation or any actions by the court encouraging it, nor have they sought to withdraw it. Thus, we can find no justification or support for Appellants' contention that the trial court punished them for raising the *in terrorem* clause.

The record does include statements by the trial court indicating its disagreement with the co-executors' use of the clause in response to the beneficiaries' attempts to clarify their right to question

---

[35]The trial court did not specifically rule on these issues. Later, all the beneficiaries, including the minors through their guardians ad litem, entered into an agreement to waive any enforcement or application of the *in terrorem* clause. Upon learning of this agreement, Appellants informed the beneficiaries that the agreement likely required approval by the court because of its impact on the distributive share of the minor beneficiaries. Appellants moved for summary judgment asking the court to declare the petition for construction to be a will contest in contravention of the will's *in terrorem* clause. These issues, as well as the proposed sale of FWC, the pending fee request, and the beneficiaries' request that Appellants resign, were part of the status conference held June 27, 1997. Mr. Pursell resigned at the conference, and Mr. Whisenant resigned a few days later. On November 12, 1997, the successor co-executors and the beneficiaries entered an agreed order withdrawing the pleadings which had invoked the *in terrorem* clause and retroactively approving the prior agreement among the beneficiaries. The trial court entered the order.

the fees of the co-executors.[36] There is only one reference in the court's ruling, incorporated into its order, to the issue.

> And then to say I sign an order that says you're an executor, and I authorize the clerk to issue the letters testamentary, and then for someone even to feel the threat of – the veiled threat of "don't question the fees of the court-appointed fiduciary or you may be disinherited" lacks good faith to such an extent that it's, arguably, bad faith.

On the basis of this sentence, Appellants assert that the trial court was in error when it found they had acted in bad faith when they raised the issue of the *in terrorem* clause. We do not agree that the equivocal statement quoted above constitutes a finding that Appellants acted in bad faith. Again, Appellants assert they were punished for bringing a legitimate dispute to the court, but, again, we find no basis for Appellants' claim that they were penalized for raising the clause. Because we find no consequence to Appellants to have resulted from the trial court's statement, we decline to address the issues raised by Appellants regarding the *in terrorem* clause. *See State ex rel. Jones v. Looper*, No. M1999-00662-COA-R3-CV, 2000 WL 354404, at *11 (Tenn. Ct. App. Apr. 7, 2000) (perm. app. denied Oct. 30, 2000) (a showing of both harm and error is required for reversal). [37]

---

[36]A large portion of Appellants' brief is spent on this issue. The record reveals that the issue was also the subject of a large part of Appellants' summation arguments at the fee hearing, and that discourse with the court ensued. We do not disagree with Appellants that the trial court clearly voiced its opinion of an executor using the threat of disinheritance to shield fee requests. However, Appellants maintained throughout that this was not the purpose of their filings, and the trial court and counsel "agreed to disagree" over the law on this issue.

[37]If Appellants are concerned that the trial court's statement implied professionally improper conduct, we note that the trial court, in fact, went out of its way to dispel such notions in another context. Although at the beginning of the status conference the court had expressed its concern about the possible conflict of interest and concomitant appearance of impropriety raised by Mr. Pursell's almost omnipresent involvement in this case, at the close of that conference, the court stated:

> And I would like to state that it's a very positive reflection on the strength of integrity of Mr. Pursell to voluntarily resign from these fiduciary capacities, and important to say, in fairness to Mr. Pursell, it would sound like he's been tried and fried without the opportunity to be heard, and that's not the case here. Some issues were raised, and what we're dealing with are principles of a concept and whether or not they create some appearances of a conflict of interest and what-have-you. And it's very important for this record to be clear and everyone in this room to fully understand that I have made no finding on any conflict of interest. I have made no finding of any professional impropriety. I have the highest regard for Mr. Pursell. He's an excellent attorney and, candidly, a very dear friend. And it's with great respect for Mr. Pursell that I think he's made a wise decision to allow this estate to go forward. And it would also be noted that Mr. Pursell had either a 14 or 17 year relationship with Mr. Wakefield, and Mr. Wakefield clearly had great respect and trust and fondness for Mr. Pursell, and that should not be lost in this situation. But I think Mr. Pursell is wise to step aside when the appearance of a conflict exists so that the case can go forward, and he is not unfairly the subject of being second-guessed in everything he's done.

-32-

V.

The beneficiaries argue that the trial court erred in allowing Appellants to retain the $50,000 each in interim executor's fees that were awarded to them by agreed order. Relying on *White v. McBride*, 937 S.W.2d 796 (Tenn. 1996), the beneficiaries maintain that if an attorney assesses a fee which is determined to be unreasonable and excessive, the attorney is not entitled to any fee, even on a *quantum meruit* basis. According to the beneficiaries, this rule should be applied to executors, at least executors who are attorneys; because the co-executors' fee request was unreasonable, they should be allowed to collect no fee. Similarly, they argue, the entire $90,000 in retainer fees Mr. Pursell received should be disgorged. The trial court denied the request that the interim co-executor fees be disgorged, finding that $50,000 per co-executor was a reasonable fee for their services up to their resignation.

The parties dispute the specificity with which a request for disgorgement of previously awarded executor fees or other fees was raised in the trial court. We need not resolve that dispute. However, the beneficiaries admit they did not ask the trial court to apply the rule of *White v. McBride* to the attorney fees awarded to Mr. Pursell for services to FWC. Such failure does not, they argue, preclude the trial court or this court from disallowing Mr. Pursell to receive any fees because he asserted a "clearly excessive" claim for attorney's fees.

The trial court had authority to award reasonable fees, and it determined that $150,000 was a reasonable fee for all co-executors. Similarly, while the court found the monthly payments under the retainer arrangement with FWC to have been unreasonable, the court allowed payment for documented time spent on legal work for FWC, an award of reasonable fees for necessary services. We have affirmed the trial court's awards in both instances, modifying the amount upward. Accordingly, we affirm the trial court's refusal to order additional disgorgements.

VI.

Accordingly, the judgment of the trial court is affirmed as modified. This case is remanded for any further proceedings which may be necessary. Costs of this appeal are to be paid by Appellants, Mr. Pursell and Mr. Whisenant, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL